## Coleman's Assigned Estate (No. 1).

*Assignment for creditors—Compensation of assignees.*

Where an assigned estate consists of many kinds of assets and amounts in value to over $4,000,000, and the assignees are an old established trust company with a large capital, and an individual who had a special knowledge of the estate from close business relations with the assignor, and the assignees had entered security in the sum of $3,000,000, and brought to the management of the estate the utmost diligence, and so conducted its complicated affairs as to realize from the assets the highest possible value to the creditors, the court will allow the sum of $49,430 as compensation to the assignees.

*Auditor—Finding of auditor—Review.*

Unless the finding of an auditor on a question of fact be manifestly erroneous, the court will not set it aside.

Argued Feb. 15, 1900. Appeal, No. 429, Jan. T., 1899, by Pennsylvania Company for Insurance on Lives and Granting Annuities and Henry T. Kendall, Assignees, from order of C. P. Lebanon Co., Sept. T., 1893, No. 169, sustaining exceptions to auditor's report in In re Assigned Estate of Robert H. Coleman. Before MITCHELL, DEAN, FELL, BROWN and MESTREZAT, JJ. Reversed.

Exceptions to report of George B. Schock, Esq., auditor.

The material portions of the report of the auditor were as follows :

The question of compensation has been so frequently litigated that the books are full of cases on the subject.    Many of these cases have been carefully examined by your auditor.    The principles enumerated are so familiar that the restatement of them, or the citation of cases, will only encumber the record.    It is the application of the principle of law as laid down in the authorities which makes the matter a question for careful consideration in each particular instance.

The appraised value of the estate as per the appraisement filed, is $4,141,126.60.    The record discloses that on December 27, 1893, H. T. Kendall, one of the assignees, filed a bond, approved by the court, in the sum of $3,000,000, with the Pennsylvania Company of Reading, Pennsylvania, as surety; and that the Pennsylvania Company for Insurance on Lives and Granting Annuities, the other assignee, on the same day, filed a bond in the same amount.

This question of suretyship was not urged upon the attention of the auditor but the courts so constantly recognize it in remunerating faithful trustees that it is a proper subject for consideration.    Taking into consideration the amount of the bond required it would be difficult, if not impossible, to furnish individual bondsmen, and the resort is therefore naturally and properly to corporate suretyship.

An act of assembly, approved June 24, 1895, not in force when these bonds were filed, and not invoked to sustain the compensation of the assignees, and since declared to be unlawful, and only referred to to show the judgment of the members of the assembly of the state of Pennsylvania and of the governor on this subject, attempted to provide that assignees might include the cost of corporate suretyship in the expense of settling estates.    While there is no such enactment in Pennsylvania it yet evidences the judgment of the legislative authorities of the commonwealth, and under that judgment, taking but half the maximum allowed by its provisions, $30,000, of the amount charged as compensation would have been allowed in payment of the corporate sureties per annum.    Corporate suretyship is so well understood as a purely business transaction that it is no violent assumption to say that a large portion of the fees

charged will have to be appropriated by these assignees in the discharge of their obligations on these bonds.

It also appears by schedules herein contained that the major portion of the balance to be distributed is the avails of real estate and must therefore be distributed to the liens of record. The only lien creditor is Archibald Rogers, and his liens are far in excess of any sum which he can hope for in this or any subsequent distribution.  The amount of commissions charged on the sale of the real estate must be charged against that fund and will avail the personal creditors, who are the only exceptants, nothing.  They cannot share in a surcharge on that account, nor can a fund raised in the distribution in which they cannot share go in relief of counsel fees.  When a surcharge brought about by the labors of one of a class goes in relief of the whole class, equity directs that the fund shall assist in compensating counsel.  A surcharge on the real estate commissions will not relieve the claims on the personal fund, except in the vague, remote contingency that at some time the record debts will be fully paid, either by the sale of real estate or of the collaterals held, or both.  That this will ever occur has not been established.  The insolvency of the estate is beyond doubt.

A surcharge upon the real estate account will not benefit the excepting creditors.  The benefit will only inure to Mr. Rogers, who is not objecting to this compensation and the auditor is not required to enter into a consideration of a surcharge on that branch of the case.  Indeed it is not his duty to consider any question except such as is raised by an issue presented by a party in interest.  It may well be these charges can be maintained in view of the facts of the case even against the objection of a party in interest.  This estate deals in large amounts and vast interests and it cannot be expected that compensation to these accountants will not be large compared with ordinary estates.

In this connection it is proper, however, to consider another objection very seriously urged against this charge.  If the exceptants have no standing to complain it is not important.  If they have it must be disposed of.  It is alleged that these assignees were vested only with the equity of the assignor in the mortgaged real estate and that they disposed of nothing else,

and that therefore they are entitled to compensation based upon a percentage of what that equity is found to be. The authorities in Pennsylvania are not numerous nor do any meet the facts in this issue. There is an apparent reason why an assignee should not be allowed compensation based on the value of real estate sold by him subject to a mortgage which remains outstanding. No such thing occurred in the disposition of this estate. The debts, mortgages and bonds, by the terms of the sale as authorized and approved by the court, were paid and eliminated as claims against the assignor as effectually as if the assignees had issued their check for the amount due, or had counted out so much money to the holders. These creditors are no longer factors in this distribution. The sale was not subject to liens in the ordinary sense, but the mere fact that the assignees did not go through the manual operation of handling so much gold, or so many notes, or sign so many checks does not deprive the real estate transaction of its character of a sale for the highest and best price to be obtained for the same divested of liens, and for such a sale, if made fairly and honestly, your auditor does not understand the law to deprive them of their proper compensation. The question of amount in any case, may be debatable. In this issue the party who is practically the sole beneficiary by a surcharge does not ask for it, and the charge itself has not been shown to be unreasonable and excessive except perhaps in this, that it is argued that the aggregate is large. The transactions accounted for cover a period of many months. It appears that while Mr. Kendall acted as attorney in fact for this estate prior to the assignment, he received a compensation of $10,000 per year. Presumably his co-attorney, Mr. Rogers, received the same compensation. It does not appear that they entered into any such bond as the law required here, nor in fact any bond at all. It is, therefore, submitted that the compensation charged should not be disturbed, because it is not shown to be unlawful and excessive, under the circumstances and because the only party having a substantial interest is not objecting.

These reasons apply practically with equal force to the commissions charged on the administration of the personal assets of the estate. These personal assets accounted for, are upwards of $700,000. The redemption of the Cornwall & Leb-

anon Railroad stocks constituted principally the most delicate and burdensome part of the management of this estate and became necessary to consummate an advantageous sale of the ore banks and furnaces. The operations of the furnaces called for constant daily care and attention, and when the creditors wisely suggested that these furnaces should be kept in operation, it is to be assumed that as business men they understood that compensation would have to be awarded.

Your auditor is of the opinion that in allowing the compensation based upon two per cent on the real estate and three per cent on the personal assets administered, considering all the circumstances of the case, is not extending the compensation beyond what the authorities recognize as proper and lawful. As a matter of fact also the unsecured creditors will bear a very small portion of expense, since the insolvency of the estate imposes by far the major portion upon the noncomplaining lien creditor. The exceptions are overruled.

Mr. Archibald Rogers holds liens of record in the court of common pleas of Lebanon county against the assignor amounting to $306,000, with interest, which were scheduled in the list of debts. This amount, made up of several mortgages and accompanying bonds, represents money loaned to the assignor by Mr. Rogers at various times, as will be more fully set out herein. These liens were also secured by the collateral assignment of a very large number of securities held by Mr. Coleman, said assignments being made and the securities delivered to Mr. Rogers prior to Mr. Coleman's general assignment for the benefit of creditors.

These securities are enumerated in two instruments of writing, dated July 21, 1893, the first intended to be additional security for judgments amounting to $94,000, and the other as additional security for $212,000 of the money so advanced. These collaterals consisted of stocks, bonds and notes of corporations operating in Florida, and other evidences of corporate investment. Certain of these securities had admittedly been realized upon by Mr. Rogers at the time of the inquiry and upon others dividends had been paid to him.

The assignees also received money and accounted for it in their first account upon some of the collateral held by Mr. Rogers. It is, however, the matter of the stocks, bonds and notes of the

Florida companies which in the main received attention in this inquiry. It appears that the interest of Mr. Coleman in the Florida railroads and other companies represented by these collaterals was involved in numerous and serious lawsuits in various judicial jurisdictions. Mr. Coleman had advanced large sums of money to the Jacksonville, Tampa & Key West Railway Company and to the Atlantic Coast, St. John's & Indian River Railroad Company, and took their bonds as collateral. He became indorser on notes to a very large extent and was secured by further assignments of stocks and bonds as collateral. These notes or many of them, subsequently maturing, were taken up by him and in the effort to fix the liability of co-indorsers and his rights against these companies, the litigation, the details of which it is not necessary to state here, has since been fiercely and continuously carried on. These notes and collateral stocks and bonds of an enormous par value, but of a dubious actual value, constitute the collaterals assigned to Mr. Rogers by the instruments above referred to. Prior to the assignment of Mr. Coleman for the benefit of creditors and prior to the collateral assignments to Mr. Rogers, it was deemed necessary by his counsel for the proper conduct of the litigation in which he had become involved in connection with these securities that some of these stocks and bonds should be sold. Proceedings were accordingly begun to make sale, and the steps so begun were continued by the same counsel under adverse circumstances after the general assignment, and of course these securities were in the hands of Mr. Rogers and sales were finally consummated.

These sales were as follows: September 27, 1893, $206,000, first mortgage bonds Jacksonville, Tampa & Key West Railway Company at $20.00, $41,200 ; October 5, 1893, $225,000 bonds of the Atlantic Coast, St. John's & Indian River Railroad Company at $20.00, $45,000 ; October 5, 1893, $656,000 bonds of the Jacksonville, Tampa & Key West Railway Company at $20.00, $131,200 ; October 26, 1893, $92,000 bonds of the Jacksonville, Tampa & Key West Railway Company at $20.00, $18,400.

These securities were all purchased by Mr. Rogers, or in his interest, and are now all within his control.

The inventory and appraisement of the assigned estate of Robert H. Coleman was not filed in court until subsequent to

these sales, but the securities in question are therein contained as assets of the estate.    The purchase price realized at these sales was indorsed as a credit upon the notes for which these securities stood as collateral.    The authority of Mr. Rogers to sell these bonds, or the manner of the sales, has not been called in question and is therefore not an issue considered.    Counsel for Mr. Rogers, however, suggests that a purchase under the circumstances and facts of this case for the purpose of divesting the interests of the assigned estate in these bonds would invalidate the sale.    In some litigation in which the status and ownership of these bonds came in question Mr. Rogers, being called as a witness, testified that he was the owner of them. This testimony was not produced in such form as to be considered to be competent evidence, but Mr. Rogers before your auditor stated that he did so testify.    For the purpose of calling the attention of the general creditors to these facts, which were submitted to them in elaborate detail, the meeting at Philadelphia on July 14, 1897, was called.

If Mr. Rogers still held these securities subject to the equity of the assigned estate he is entitled to come in on the fund with his liens.    If, on the other hand, he was the absolute owner of them, he is in a large measure eliminated as a distributee, as the sum realized at the sales of collateral would have to go in satisfaction of his liens.    The claim of the general creditors is that Mr. Rogers should be held to be the owner of these securities and should be required to account for them at the price bid at the sales.    Mr. Rogers claims that he should still be allowed to retain them subject to the equity of the assigned estate; that he has expended large sums of money out of his private estate to maintain the interest of the assigned estate when no one else would do so, for counsel fees and for various other items, an account of which he renders and asks to be reimbursed for said expenditures.

So far as the present record shows the testimony of Mr. Rogers alluded to, as having been given in the southern litigation, and which testimony called forth the present inquiry in regard to the ownership of these bonds, is contained in the examination of Mr. Rogers as follows :

" Q. After this sale of the bonds in Philadelphia in making your claim against the Florida Railroad in Florida, as I under-

stand it, you presented the bonds as owner, credited on the notes to which the bonds were collateral the amount realized from the sale of the bonds? A. I think the amount realized from the sale of the bonds was credited on the notes. I don't think there is any question about that. There is a good many of these things the lawyers did I cannot swear to on oath, but if you really want to know the facts in the case it can be very easily arrived at by asking Mr. Bartlett or Mr. Kendall. Q. The amount realized from the sale of these bonds was credited on the notes held by you as collateral? A. That is my recollection of it at this time. Q. Then the bonds were presented by you as owner as claims against the companies in Florida? A. When? Q. Were they ever presented by you as owner? A. In the lawsuit I said that so far as I did testify that I was the owner of the bonds for the purpose of that railroad suit were concerned. Q. Do you mean to say that you testified as to the owner of the bonds for the purpose of the railroad suit, or did you testify that you were the owner of the bonds? A. Not the absolute owner of the bonds but as against the railroad company I was the absolute owner of the bonds. Q. How did you testify — what was your testimony? Did you say 'I am the owner of the bonds so far as the purposes of this suit were concerned,' or that 'I am the owner of the bonds'? A. I forget the exact language that I used, probably something like that, that 'I am the owner of the bonds.' Q. You have no recollection of saying in that suit down there that 'I am the owner of the bonds so far as this suit is concerned'? A. I can't swear as to the exact language I used. Q. You have no recollection of having so qualified your testimony, have you? A. No."

In further explanation of the status of these bonds Mr. Rogers testified:

" If Mr. Jones wanted to be sincere and wanted to get at the facts I would have told him. These bonds were purchased in the interests of the assigned estate and not in the interest of A. Rogers individually. Q. Did you ever authorize anybody to purchase these bonds for you? A. I never authorized anybody to purchase these bonds for me individually. Q. Did you ever have any conversation with any of the assignees of Robert Coleman with regard to the sales or the purchase of the bonds

at the sale? A. I remember one conversation in which I said I would not bid a cent myself. Q. With whom did you have that conversation? A. With Mr. Kendall. Q. Will you explain about the sales of these bonds? A. As near as I can remember the occasion— Q. Give the purpose for which the bonds were sold. A. The occasion which arose for the immediate sale of these bonds at that time was that previous to Mr. Coleman's assignment there to me or for the benefit of his creditors, Mr. Kendall and I, in Mr. Coleman's absence in Europe, represented Mr. Coleman by powers of attorney to act for him. We found that the situation of affairs in Florida was exceedingly mixed up, involving many points of law with which we were totally unfamiliar and we placed Mr. Coleman's interests in the joint hands of lawyers in New York and Mr. Johnson in Philadelphia. Q. Who were the lawyers in New York? A. Messrs. Simpson, Thatcher and Barnum. Now these lawyers got in consultation with each other and advised us what steps were necessary to take — rather they practically went ahead themselves and simply directed us to carry out any details. We finding that it was absolutely necessary to get title as against the railroad company to some of these bonds which were issued as collateral and notes, Mr. Kendall attempted to have some of the bonds sold but was restrained by Mason Young and I think the American Construction Company. I think they were virtually the same thing — Mason Young is recognized as the enemy on the other side as endeavoring to ruin the property. They employed Wayne MacVeagh, Wayne MacVeagh got out an injunction to restrain the sale of these bonds which we were endeavoring to get title to as against the railroad company. Then following that, of course that sale was prevented — following that I think counsel advised selecting some bonds upon which this technical point had not arisen causing the injunction. I have forgotten whether it was in New York, I think it was—"

Mr. Bartlett: It was in Philadelphia.

Witness: I had forgotten just where it was now, it is so long ago. In the mean time Coleman made the assignment to me and conveyed a lot of notes to me holding as collateral railway bonds. Now I presume that without any absolute instructions on my part counsel went ahead, carried on the same plan that

had been outlined previous to the assignment and sold these bonds the instant the injunction could be removed. I think very shorly after Coleman made the assignment Johnson, Coleman's lawyer, and necessarily he followed then—I had taken Coleman's place under this assignment, kept on of course with Mr. Johnson's advice. He beat Wayne MacVeagh in arguing the injunction and the injunction was removed and as a result these bonds were sold by Freeman and Thomas. Now this was all managed by counsel, you may say, that represented the assignees and represented me and represented claimants interested. Virtually all interests were represented, creditors of all kinds and descriptions and principals, and these bonds were sold and credit given on the notes. There was never any credit taken by the assignees for the amount of the sale on the individual account as between me and the assignees. I never entered on my accounts as between me and Coleman and in point of fact it never was so understood and it could not have been, because the assignees went to work and shortly afterwards they scheduled all these bonds that I caused to be sold, put them down on their schedule of assets without allowing any deduction for the twenty per cent which was paid. If I had been purchasing these bonds for myself I certainly would not have bought them in at twenty, and certainly if the assignees had been doing right they would not have allowed me to buy them in at twenty when the bonds were worth considerably over fifty at that time.

The record discloses further testimony of the same character on this subject.

Mr. Kendall in his testimony states that he never understood that Mr. Rogers was to become the individual owner of these bonds by virtue of this sale, and Mr. Bartlett corroborates Mr. Kendall's testimony and amplifies the condition of affairs at that time.

The testimony therefore all tends to establish the fact that notwithstanding that Mr. Rogers did testify, under the advice of counsel, that he could truthfully say that he was the owner of the bonds, he still holds them subject to the equity of Robert H. Coleman, the assignor. The whole testimony shows that Mr. Rogers had very little to do with the sale of these securities and that no one connected with the sales intended that by

striking them off to him he should be invested with absolute ownership. Whether the equities of the railroad company and the construction company are divested is of no consequence here, when all the evidence tends to establish the fact that the interests of the assigned estate is not divested, and it was never intended to be divested, and when the assignees did not insist upon an absolute ownership in Mr. Rogers, but so far as they do appear, state that he did not become the owner as against the estate, there is no path open but to decree that distribution must be made on the liens of record in favor of Mr. Rogers notwithstanding these sales.

Exceptions to the auditor's report were sustained by the court in an opinion by SIMONTON, P. J., specially presiding.

*Errors assigned* were (1) in deducting $36,451.05 from the compensation of the assignees and in surcharging them with that amount; (2) in surcharging the assignees with $30,009.55 on account of the sale of 6,731 shares of the Cornwall & Lebanon Railroad Company; (3) in surcharging the assignees with $25,643.75 as excess of amount of sales of Jacksonville, Tampa and Key West Railway bonds over balance of A. Rogers's judgment.

*George F. Baer* and *John G. Johnson*, with them *Grant Weidman*, for appellants, cited: Davis's App., 89 Pa. 272; Frank's App., 59 Pa. 190 ; Kent, Santee & Co.'s App., 87 Pa. 165.

*Robert Snodgrass* and *Thomas H. Capp*, with them *Lewin W. Barringer, C. H. Killinger, Howard C. Shirk, John A. Coyle* and *A. A. Stevens*, cited: Miller's App., 35 Pa. 481; Jordan's App., 107 Pa. 75; Dean & Son's App., 98 Pa. 101.

OPINION BY MR. JUSTICE DEAN, July 17, 1901:

It is unnecessary to relate the facts which are fully and elaborately set forth by the auditor and learned court below ; sufficient to say that the assigned estate was a very large one and one consisting of many kinds of assets, mainly railroad stock and bonds and interests in ore banks and iron furnaces. The whole assets were appraised at $4,141,126.92, of which $3,439,948.68 was designated as real estate, $712,177.92 was personal property,

and in addition a large amount of property so indefinite in name and value that it was not specially detailed in the appraisement. Much of this last named property was in the states of Georgia and Florida. It passed to the management of the assignees and was controlled and protected by them as its condition and situation required. At the date of appointment of the assignees, however, the value was roughly estimated at $2,174,791.61. The account showed that the assignees had realized on a large part of the property in their hands, i. e., iron furnaces, ore banks and railroad stock, over $4,000,000. The question as to the management and sale of this vast estate for the benefit of creditors, the amount of whose claims from the very beginning was uncertain and at that time, in the then depressed condition of business affairs, in all probability exceeded the value of the assets, was a very grave and doubtful one. In the judgment of the assignees it was to the benefit of creditors that the property be sold as a whole to one purchaser rather than have it broken up and sold in pieces to many purchasers. No intelligent man having a knowledge of the character, uses and value of such property will undertake to question the soundness of their judgment in this particular. It must be sold as a whole or it would have been to a great degree sacrificed. After unremitting efforts for months to sell it as a whole, a sale was finally negotiated by the assignees to the Lackawanna Iron & Steel Company. This sale amounted to $2,729,640.50. The sale was made subject to the confirmation of the court of common pleas of Lebanon county, which court did confirm and approve the sale. Other sales of other assets were made by the assignees and approved by the court. They had given bond for the faithful performance of their duties, each in sum of about $3,000,000. Of course the sum being such a large amount, corporate sureties had to be furnished. The accountants were both competent. The auditor has found as a fact on abundant evidence that they brought to the management of the estate the utmost diligence and so conducted all its complicated affairs as to realize from the assets the highest possible value for the creditors.

For the services and commissions on sale of real estate they took credit for $49,430.02. The court cut this down and allowed them $12,978.97, and directed that they be surcharged

with the excess of $36,431.05. The court further directed that they be surcharged with a loss by them in selling stock in Cornwall and Lebanon Railroad with sum of $30,009.55.

The court below in sustaining exceptions to the amount of compensation and directing the large reduction that it did make, gives as its principal reason therefor, that the value of services performed in sale of this property is largely overestimated, and that the value placed upon them is an unreasonably high one. There is no fixed and unbending rule for determining the compensation of trustees, as is aptly stated by the auditor.

Many persons can and do manage the ordinary trust estates with prudence, fidelity and skill, and courts are not illiberal in awarding compensation in such cases ; but care and skill are relative qualities. A person fitted to adminster an ordinary trust estate with satisfactory results would in all probability be entirely unfitted to manage and dispose of an estate like the one now under consideration. It is those in touch with large interests who are best fitted to manage and dispose of large diversified properties. In this estate good judgment was exercised in the choice of the trustees. The Pennsylvania company is so well known that no one questions the propriety of entrusting so extensive an estate to its care. Mr. Kendall was for many years familiar with all the details of this vast estate and latterly, before the assignment in connection with Mr. Rogers, was attorney in fact for the assignor, having charge of all the property and interests conveyed.

So that he brought to the administration of the affairs of the estate a knowledge which it would have required other persons months to acquire. A judgment exercised by assignees so satisfactory becomes an argument in favor of its propriety; and skill, experience and knowledge are elements for which the courts award compensation. The certainty that the assets accounted for by a trustee will be forthcoming at the proper time is worth money. To enforce this certainty the law requires that bond be given by the trustee and approved by the court having jurisdiction of the account. The law is therefore reasonable when it provides that the individual responsibility of the trustee and his ability to fortify it by the guarantee of others who are responsible shall aid in the measurement of his compensation.

After a thorough examination and a careful consideration of the whole case disclosed in these elaborate paper-books, and in consideration of the fact that the fees paid by these assignees to their sureties approximated $25,000, under the usual rate of charges, we are of the opinion that the auditor's conclusion is a correct one, and we therefore adopt it as the conclusion of this court.

This disposes of the first and second assignments of error of the appellants.

As to the third assignment wherein the court directed that the assignees be surcharged with a sum of $25,643.75 as excess of the amount of sales of railroad bonds over a balance of Archibald Rogers's judgment, the auditor has found as a fact that Rogers held these securities purchased by him for the benefit of the assigned estate and was not the absolute owner of them though in a sense the absolute purchaser of them, and this finding is based on absolute evidence, the auditor having witnesses of the surroundings and the sale before him. Therefore the liens of Rogers against the assigned estate were not affected by the sale. We do not think this finding was erroneous. True there might be drawn from the testimony an inference that Rogers purchased for himself, but he testifies he did not, the assignees do not testify that he did, and we think the rule that unless the finding of an auditor on a question of fact be manifestly erroneous the court will not set it aside, constrains us to sustain the finding of the auditor. All assignments are therefore sustained and it is directed that the record be sent back that distribution may be made in accordance with our opinion.